UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JOY PARNES and BRIAN
PARNES, individually and on
behalf of S.P., a minor child,

        Plaintiffs,

v.                                        Case No. 6:23-cv-854-JA-LHP

ORANGE COUNTY SCHOOL
BOARD,

        Defendant.

## ORDER

Orange County School Board moves to dismiss Joy and Brian Parnes's complaint for failure to exhaust administrative remedies and failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (*See* Doc. 16).[1] Having considered the parties' submissions, the Court finds that the motion must be denied.

I.    Facts

The Parneses have a twelve-year-old daughter named S.P. (Doc. 1 ¶¶ 4–6). Before she entered kindergarten, S.P. was diagnosed with disabilities that

---

[1] The Board also cites Federal Rule of Civil Procedure 12(e), (Doc. 16 at 1), but makes no argument with respect to a more definite statement of the Parneses' complaint, (*see id. passim*).

affect her learning. (*Id.* ¶¶ 7, 13). Her disabilities include attention deficit/hyperactivity disorder, dyslexia, dyscalculia, dysgraphia, developmental venous anomaly, sensory processing disorder, expressive receptive language disorder, auditory processing disorder, developmental and cognitive delay, fine motor delay, gross motor delay, bilateral hand tremors, and febrile seizures. (*Id.* ¶ 7). The Board was "well aware of S.P.'s education and medical history" at all relevant times. (*Id.* ¶ 25).

Until February 2021, S.P. attended Bay Meadows Elementary School in Orlando, Florida. (*Id.* ¶¶ 12, 65). She had an individualized education plan (IEP) and qualified for special education services. (*Id.* ¶ 12). When she attended school in person, the Board accommodated her disabilities by providing her with special supplies like "hi-write paper to assist with her writing, manipulatives to assist with math, and hand weights to help treat her hand tremor." (*Id.* ¶ 30). In 2020, she was in the third grade. (*Id.* ¶ 12).

In February 2019 and February 2020, according to the Board, S.P. was involved in two incidents in the school cafeteria. (*Id.* ¶¶ 36, 40–41). Three days after the February 2019 incident, the Board punished S.P. by making her "sit in isolation" during lunch "in front of the other students in the cafeteria," and the Board did not punish in the same way "other students involved in the incident." (*Id.* ¶ 37). The Board also "forced S.P. to sign a statement regarding the incident that she was unable to read." (*Id.* ¶ 39). The Board did not consider S.P.'s

2

disabilities when deciding how to handle the incident and "unfairly punished" S.P. in a way that caused her "severe emotional distress." (*Id.* ¶ 38).

In February 2020, S.P. was punished for her "alleged response to bullying that occurred in the cafeteria." (*Id.* ¶¶ 40–41). At first, she received a one-day suspension. (*Id.* ¶ 42). But the next day, the Board "sent a letter stating that the punishment had been changed to a [ten]-day suspension" and that it was "recommend[ing] expulsion." (*Id.*). "Shortly" after the Board sent this letter, it "changed [its] position again" and said that S.P. "could return to school the following morning." (*Id.* ¶ 43). As before, the Board did not consider S.P.'s disabilities when deciding how to handle the incident. (*Id.* ¶ 44).

From March 2020 to February 2021, S.P. attended Bay Meadows Elementary School virtually because she was at a high risk of getting sick during the Covid-19 pandemic. (*Id.* ¶ 15). S.P.'s disabilities made virtual schooling difficult for her, and the Board only created more difficulties. (*Id.* ¶ 16). The Board "knew or should have known that S.P. was not capable of self-directed learning based on her disabilities." (*Id.* ¶ 25). S.P. was also having problems using the school's digital platform. (*Id.* ¶ 27). Although the Parneses informed S.P.'s teachers and the Board many times about S.P.'s problems with the platform, (*id.*), the Board did not "provide S.P. with [the] assistive technology devices that she needed . . . to navigate the . . . platform." (*Id.* ¶ 30). Similarly, the Board no longer provided S.P. with the special supplies (e.g., hi-

3

write paper, manipulatives, and hand weights) that it had given to her to accommodate her disabilities when she attended school in person. (*Id.*). And, to make matters worse, the Board did not appropriately implement, review, or revise S.P.'s IEP during the pandemic. (*Id.* ¶¶ 23–24). For all these reasons, S.P. started getting failing grades "for the first time in her academic career" after she switched to virtual schooling. (*Id.* ¶ 26).

Another source of difficulties for S.P.'s education was Sarah Koren, an attorney for the Board. (*Id.* ¶ 16). The Parneses' relationship with the Board "did not turn contentious until . . . Koren . . . became involved in S.P.'s education." (*Id.* at 4 n.1). The Parneses had been "communicat[ing] freely with S.P.'s teachers about [S.P.]'s academic progress and educational needs," but Koren told S.P.'s teachers to stop responding to them. (*Id.* ¶¶ 33–34). Because S.P.'s teachers did as Koren advised and stopped responding, it was more difficult for the Parneses to help S.P. with her assignments and to make sure that her educational needs were met. (*Id.* ¶ 35).

Given the decline in S.P.'s academic performance, the Parneses filed two administrative complaints against the Board with the Florida Department of Education's Bureau of Exceptional Education and Student Services (BEESS). (*Id.* ¶ 45). An August 2020 complaint alleged that the Board "failed to educate . . . S.P. appropriately and failed to develop a plan to implement [her]

IEP since March 2020." (*Id.* ¶ 46). And a September 2020 complaint addressed "Koren's discriminatory conduct." (*Id.* at 23 n.5).

Nearly two weeks after the Parneses filed the August 2020 complaint, they received a letter from the Board "falsely alleging that S.P. had been absent" from her virtual schooling for six days that month when in fact she had been present on three of the six days. (*Id.* ¶¶ 107–08). The letter warned the Parneses that a "pattern of truancy" could result in "[p]enalties, fines," or "referral to law enforcement or the State Attorney[,]" among "other consequences." (*Id.* ¶ 107 (alterations in original)). The Parneses viewed this letter as retaliation for filing the August 2020 complaint. (*Id.* ¶ 109).

In resolving the administrative complaints, BEESS agreed with the Parneses that the Board had denied S.P. a free and appropriate public education (FAPE) and had not appropriately reviewed and revised her IEP, in violation of federal and state regulations. (*Id.* ¶¶ 49–50; *id.* at 23 n.5). Accordingly, BEESS ordered the Board to take specific corrective actions, giving it clear deadlines for doing so. (*Id.* ¶ 51). For example, by November 13, 2020, the Board had to "convene an IEP team meeting" to achieve certain objectives regarding S.P.'s progress, and by December 4, 2020, it had to train "all relevant district and school-based staff" on the FAPE and IEP regulations that it had violated. (*Id.*). The Board also had to submit documentation to BEESS to prove that it had taken the corrective actions. (*Id.*). The Board had to submit verification of the

IEP team meeting by November 20, 2020, and of the training by December 11, 2020. (*Id.*). Despite these detailed instructions, the Board did not take the corrective actions; rather, it "intentionally ignored" BEESS's decision. (*Id.* ¶ 64).

A month after BEESS issued its decision ordering the corrective actions, the Board challenged the decision in concurrent state proceedings before the Division of Administrative Hearings and the Fifth District Court of Appeal. (*Id.* ¶¶ 54, 56). Each challenge was dismissed for lack of jurisdiction. (*Id.* ¶¶ 59–60). Even after these dismissals, the Board "still failed to comply with" BEESS's decision. (*Id.* ¶ 63).

Because the Board failed to provide S.P. with the accommodations she needed to receive a FAPE, she "was forced," in February 2021, "to withdraw from Bay Meadows Elementary School . . . and to leave the Orange County School District." (*Id.* ¶ 65). After S.P. left Bay Meadows Elementary School, the Parneses "were forced to enroll [her] in private school at the House of Academia," where tuition "cost approximately $700.00 per month." (*Id.* ¶ 67). At some point, S.P. left the House of Academia and was enrolled "in private school at Lindamood-Bell," where tuition "is approximately $82,000 [to] $89,000 for [nineteen] months." (*Id.*).

In May 2023, the Parneses sued the Board for disability discrimination and retaliation related to S.P.'s education. (*Id.* at 15–25). The complaint contains three counts: disability discrimination under Title II of the Americans

6

with Disabilities Act of 1990 (ADA) (Count I); disability discrimination under the Rehabilitation Act (Count II); and retaliation under the ADA (Count III). (*Id.*). The Parneses seek compensatory "damages, attorney's fees, and costs." (*Id.* ¶ 66).

## II.   Rule 12(b)(6) Standard

In deciding motions to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), courts "accept the allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Henley v. Payne*, 945 F.3d 1320, 1326 (11th Cir. 2019). For a pleading to state a claim for relief, it "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[D]etailed factual allegations" are not required, but "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Generally, at the pleading

stage, courts are "limited to the four corners of the complaint." *St. George v. Pinellas County*, 285 F.3d 1334, 1337 (11th Cir. 2002).

## III. Discussion

Primarily, the Board moves to dismiss the Parneses' complaint for failure to exhaust administrative remedies. (*See* Doc. 16 at 4–14, 18–20). The Board contends that the Parneses have alleged violations of the Individuals with Disabilities Education Act (IDEA) related to S.P.'s education, that they had to exhaust their IDEA allegations administratively in due process proceedings before they could sue in federal court, that the state administrative proceedings described in the complaint did not satisfy this exhaustion requirement, that the Parneses "have no means by which to cure their failure to exhaust" because the statute of limitations has run, and that the complaint should thus be dismissed with prejudice. (*Id.*). The Board also argues that Counts I and II fail to state a claim for relief. (*Id.* at 14–18).[2] The Court discusses these issues in turn.

---

[2] The motion's headings indicate that the Board will discuss Count III's failure to state a claim as a separate issue from failure to exhaust, just as the Board does for the other counts. (*See* Doc. 16). But in the subsection for Count III's failure to state a claim, the Board makes another argument related to exhaustion. (*See id.* at 18–20). Because the Board "d[oes] not develop any argument under that subsection" about Count III's failure to state a claim, the Court will not address that issue. *Rubinstein v. Yehuda*, 38 F.4th 982, 995 (11th Cir. 2022) ("A party can waive an issue by making only a passing reference to it and failing 'to make arguments and cite authorities in support of [the] issue.'" (alteration in original) (quoting *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012))). (*See* Doc. 20 at 15 n.8 ("[The Board]'s [m]otion does not specify how [the Parneses] failed to allege the necessary elements of a retaliation claim.")).

A.  **Failure to Exhaust**

The IDEA states, as a general rule, that "[n]othing in [the IDEA] shall be construed to restrict or limit the rights, procedures, and remedies available under" the ADA or the Rehabilitation Act. 20 U.S.C. § 1415(*l*). The IDEA then provides an exception to this general rule: before a plaintiff files a civil action under the ADA or the Rehabilitation Act "seeking relief that is also available under" the IDEA, the plaintiff "shall . . . exhaust[]" the procedures for administrative review under the IDEA "to the same extent as . . . required" if the plaintiff had brought the action under the IDEA. *Id*. The Supreme Court has clarified that the word "relief" in this statutory language means "remedies" such that the administrative exhaustion requirement does not apply when a plaintiff seeks a remedy that is not available under the IDEA. *Perez v. Sturgis Pub. Schs.*, 143 S. Ct. 859, 864 (2023).

Tort-like money damages, such as compensatory damages, are not available under the IDEA. *See id.*; *Ortega v. Bibb Cnty. Sch. Dist.*, 397 F.3d 1321, 1325–26 (11th Cir. 2005). Thus, a plaintiff seeking compensatory damages or other tort-like money damages under the ADA or the Rehabilitation Act does not have to exhaust administrative remedies under the IDEA before bringing suit. *See Perez*, 143 S. Ct. at 864 ("The [IDEA]'s administrative exhaustion requirement applies *only* to suits that "see[k] relief . . . also available under"

[the] IDEA. And that condition simply is not met . . . where a plaintiff brings a suit under another federal law for compensatory damages.").

Because the Parneses seek tort-like money damages unavailable under the IDEA, the IDEA's administrative exhaustion requirement does not apply to their claims. Accordingly, the complaint will not be dismissed for failure to exhaust.

### B. Failure to State a Claim

Discrimination claims brought under Title II of the ADA are analyzed under the same legal standards as discrimination claims brought under the Rehabilitation Act. *See Christmas v. Nabors*, 76 F.4th 1320, 1333 (11th Cir. 2023). To state a claim for relief, a plaintiff bringing ADA and Rehabilitation Act discrimination claims must plead that (1) the individual who suffered the discrimination "is a qualified individual with a disability" and (2) "was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity" and that (3) "the exclusion, denial of benefit, or discrimination was by reason of the . . . disability." *Id.* (quoting *J.S. v. Houston Cnty. Bd. of Educ.*, 877 F.3d 979, 985 (11th Cir. 2017)). In the education context, the plaintiff must also establish more than the defendant's mere failure to provide a FAPE. *See J.S.*, 877 F.3d at 985–86.

The Board contends that the Parneses do not allege more than a mere failure to provide a FAPE. (*See* Doc. 16 at 15–17). The Board further maintains that the Parneses "fail to plead any facts to support their conclusory allegation" that S.P. suffered discrimination "solely[3] because of [her] disabilit[ies]." (*Id.* at 17–18). The Court disagrees.[4]

With respect to whether a plaintiff alleges more than a mere FAPE violation, hypotheticals about children at other public facilities besides schools and about adults at school provide useful guidance for most—but not all—claims. *See J.S.*, 877 F.3d at 986. That is, a claim likely does not concern a FAPE violation if "the claim could have been brought if the alleged conduct occurred

---

[3] Unlike Title II of the ADA, the Rehabilitation Act uses the adverb "solely" to describe its causation element. *Compare* 42 U.S.C. § 12132 ("[N]o qualified individual with a disability shall, *by reason of such disability*, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." (emphasis added)), *with* 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability . . . shall, *solely by reason of her or his disability*, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving [f]ederal financial assistance or under any program or activity conducted by any [e]xecutive agency or by the United States Postal Service." (emphasis added)).

[4] The Board also cites a nonbinding case for the proposition that to state a claim for relief, the Parneses must plead that the Board's conduct exhibited gross misjudgment or bad faith or that S.P. was discriminated against solely because of her disabilities. (Doc. 16 at 15 (citing *W.C. v. Cobb Cnty. Sch. Dist.*, 407 F. Supp. 2d 1351, 1364 (N.D. Ga. 2005))). The Board notes that the Parneses do not allege gross misjudgment or bad faith. (*Id.*). The Parneses do, however, allege that S.P. was discriminated against solely because of her disabilities. (Doc. 1 ¶¶ 14, 76, 88). Thus, even accepting the Board's proposition, the Court finds it insignificant that the complaint does not directly mention the Board's bad faith or gross misjudgment. (*See id. passim.*)

at a public facility outside of a school (such as a public theater or library)" or "could have been brought by an adult at the school." *Id.* For example, if a student in a wheelchair sues her school because it does not have access ramps, her claim does not concern a FAPE violation because a child at a public theater or an adult at the school could also bring such a claim. *See Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 171–72 (2017). The same is true if a teacher hits a disabled student and the student sues, for disabled children could sue if a librarian hit them and adults could sue if a teacher hit them. *See id.* at 172 n.9. In contrast, a claim that a school "fail[ed] to provide remedial tutoring in mathematics" concerns merely a FAPE violation because a disabled child cannot "mak[e] the same claim against a public theater or library" and a disabled adult cannot "su[e] the school to obtain a math tutorial." *See id.* at 172–73. Although these hypotheticals are generally useful, some claims "do[] not fit neatly into [them]" but still go beyond merely a FAPE violation. *J.S.*, 877 F.3d at 986. The key distinction is that FAPE claims address the "adequacy of special education" while claims of intentional disability discrimination brought under Title II of the ADA and the Rehabilitation Act address "equality of access to public facilities." *Fry*, 580 U.S. at 172.

The Parneses' allegations include conduct that goes beyond a FAPE violation; thus, the Parneses plead more than the mere failure to provide a FAPE. For example, the Parneses claim that the Board's "fail[ure] to provide

12

S.P. with assistive technology devices" impaired her ability "to navigate the school's digital platform." (Doc. 1 ¶ 29). In other words, S.P. could not fully access or understand the content on the school's website. A disabled adult in that situation could bring a claim for discrimination. *See Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1114 (11th Cir. 2021) (finding that a deaf plaintiff "was personally and directly subjected to discriminatory treatment when [the defendant city] published videos on its website that [the plaintiff] accessed but could not understand" because the videos did not have closed captions); *Nat'l Ass'n of the Deaf v. Florida*, 980 F.3d 763, 773 (11th Cir. 2020) (holding that adding closed captions to online videos of legislative proceedings was a reasonable and proportionate remedy for deaf people's lack of access); *Haynes v. Hooters of Am., LLC*, 893 F.3d 781, 782–83 (11th Cir. 2018) (concluding that a blind plaintiff's claims were not moot when a restaurant allegedly discriminated against him by operating a website that was incompatible with his screen reader software).

The Parneses also allege that per Koren's instructions, S.P.'s teachers stopped responding to the Parneses' phone calls and emails. (Doc. 1 ¶ 34). This claim cannot be "easily divorce[d] . . . from the context of [S.P.] being an elementary student at a school," but it nonetheless seems "cognizable as a . . . claim for intentional" disability discrimination. *J.S.*, 877 F.3d at 986. The policy of not responding to the Parneses has less to do with the adequacy of S.P.'s

education than with the Parneses' ability to access information from the school. And the policy could "implicate . . . intangible consequences of discrimination . . . result[ing] from isolation," thereby "reach[ing] beyond" FAPE problems, such as "a misdiagnosis or failure to provide appropriate remedial coursework," to constitute actionable disability discrimination. *Id.* at 987. Consider an analogous situation: a disabled adult who receives inadequate responses from his supervisor about his work could sue for disability discrimination. *See Beasley v. O'Reilly Auto Parts*, 69 F.4th 744, 748, 755 (11th Cir. 2023) (noting that although the supervisor of the deaf plaintiff agreed to send him text messages summarizing the nightly pre-shift meetings, the supervisor repeatedly failed to do so; holding that "[a] factfinder could reasonably determine that [the plaintiff]'s inability to understand or participate in the pre-shift meetings . . . adversely affect[ed] the terms, conditions, and privileges of his employment"; and reversing the summary judgment for the defendant company).

In addition, the Parneses allege discrimination related to two cafeteria incidents that goes beyond the Board's mere failure to provide a FAPE. The Parneses claim that in February 2019, the Board punished S.P. by making her "sit in isolation . . . in front of . . . other students," did not punish in the same way "other students involved in the incident," and "forced S.P. to sign a statement regarding the incident that she was unable to read." (Doc. 1 ¶¶ 37,

14

39). Physically isolating a disabled student from other students can be more than a mere FAPE violation. *See J.S.*, 877 F.3d at 986 (examining a claim that a school isolated a disabled student from other students and finding that the claim "could be brought as a FAPE violation" but was "also cognizable as a separate claim for intentional discrimination under the ADA" and the Rehabilitation Act); *see also id.* at 987 (citing *K.M. ex rel. D.G. v. Hyde Park Cent. Sch. Dist.*, 381 F. Supp. 2d 343, 360 (S.D.N.Y. 2005)—a case about "a disabled student's isolation during lunch"—when explaining what amounts to more than a mere failure to provide a FAPE).

The Parneses further allege that in February 2020, the Board kept changing its mind about how it would punish S.P. for her "alleged response to bullying that occurred in the cafeteria." (Doc. 1 ¶¶ 40–41). As alleged, a one-day suspension became a ten-day suspension and recommended expulsion overnight and, just as suddenly, ended with S.P. returning to school within a few days of the incident. (*Id.* ¶¶ 42–43). That situation parallels one in which a disabled adult at the school is first suspended without pay for a day, is then told that her suspension without pay would last ten days and that she could be terminated, and is ultimately allowed to return to work before the ten days are up. Because the adult in that situation could likely sue, *see Doe v. Dekalb Cnty. Sch. Dist.*, 145 F.3d 1441, 1447 (11th Cir. 1998) ("[T]he ADA prohibits 'a broad variety of adverse employment actions, whenever those actions are taken for a prohibited

15

reason.'" (quoting *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1077 (11th Cir. 1996))), the allegations about the February 2020 cafeteria incident likely do not involve merely a FAPE violation.[5] Generally, because the Parneses' discrimination claims go beyond the Board's mere failure to provide a FAPE, they will not be dismissed on the basis that they do not.

The Board also argues that the complaint should be dismissed because it contains insufficient factual support for the allegation that S.P. was discriminated against solely because of her disabilities. (Doc. 16 at 17–18). But at the pleading stage, the Court must accept the complaint's well-pleaded factual allegations as true and "construe them in the light most favorable to" the Parneses. *See Henley*, 945 F.3d at 1326. The complaint's allegations support that S.P. suffered discrimination "solely because of her disabilities." (Doc. 1 ¶ 14). The complaint does not contain claims for other types of discrimination or retaliation, such as those based on gender, race, or age. (*See id. passim*). Rather, the focus throughout the complaint is on S.P.'s disabilities and the discrimination and retaliation that she (and her parents as her advocates) allegedly faced because of her disabilities. The Board does not cite to anything

---

[5] It is worth noting that the Board itself describes the allegations about the cafeteria incidents as claiming that the Board "imposed discipline on S.P. that was 'unfair.'" (Doc. 16 at 16). The Board does not explain why the imposition of unfair discipline is a problem specific to children in public schools, as opposed to children at other public facilities or to adults in public schools, (*see id.* at 15–17), and the Court sees no reason why it would be.

in the complaint that undermines the allegation that S.P. was discriminated against solely because of her disabilities. (*See* Doc. 16 at 17–18). Instead, it repeats its earlier argument that the complaint fails to plead more than the Board's mere failure to provide S.P. with a FAPE. (*Id.*). Because the discrimination claims "plausibl[y]" allege that S.P. was discriminated against solely because of her disabilities, *see Iqbal*, 556 U.S. at 678, they will not be dismissed for failure to state a claim.

## IV. Conclusion

Accordingly, it is **ORDERED** that the Board's motion to dismiss (Doc. 16) is **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida, on September 28, 2023.

   _____
   JOHN ANTOON II
   United States District Judge

Copies furnished to:
Counsel of Record