UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**JOY PARNES and BRIAN PARNES,**

**Plaintiffs,**

**v.** **Case No. 6:23-cv-854-JA-LHP**

**ORANGE COUNTY SCHOOL BOARD,**

**Defendant.**

---

## ORDER

Before the Court is the *Daubert* motion of Defendant, Orange County School Board (the Board).[1] (Doc. 53). Based on the Court's review of the parties' submissions, the motion must be granted in part and denied in part.

## I. BACKGROUND

In May 2023, Joy and Brian Parnes filed this lawsuit against the Board for disability discrimination and retaliation related to the education of their minor daughter, S.P. (Doc. 1 at 15–25). Pursuant to Rule 702, the Parneses seek to introduce the opinion testimony of Timothy Conway, Ph.D. in support of their theory that S.P. requires accommodations and the cost of those accommodations including private schooling. Fed. R. Evid. 702. The Board now

---

[1] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

moves to exclude all of Dr. Conway's testimony.

## II. LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert opinion testimony and "compels" the Court "to perform [a] critical 'gatekeeping' function." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (quoting *Daubert*, 509 U.S. at 589 n.7, 597); *see* Fed. R. Evid. 702 ("A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.").

To decide the admissibility of an expert's opinions, the Court "engage[s] in a rigorous three-part inquiry" and considers (1) whether the expert is qualified to provide the opinions, (2) whether "the methodology by which the expert reache[d the opinions] is sufficiently reliable," and (3) whether in providing the opinions, the expert will help the factfinder "understand the evidence or . . . determine a fact in issue." *Frazier*, 387 F.3d at 1260 (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)).

To determine whether the expert's methodology is reliable, the Court

applies factors from *Daubert* and *Joiner*[2]: (1) whether the expert's theory or technique can be (and has been) tested; (2) whether the expert's theory or technique has been subjected to peer review and publication; (3) what the theory or technique's known or potential rate of error is, and whether there are standards controlling its operation; (4) whether the theory or technique is generally accepted in the field; and (5) whether there is an analytical gap between the data and the opinion proffered. *Daubert*, 509 U.S. at 593–94; *Joiner*, 522 U.S. at 146; *see United States v. Pon*, 963 F.3d 1207, 1220 (11th Cir. June 29, 2020). "The party offering the expert has the burden of" establishing the expert's qualifications, the methodology's reliability, and the opinions' helpfulness to the factfinder "by a preponderance of the evidence." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005).

## III. DISCUSSION

Dr. Conway was retained by the Parneses to opine on several issues in this case, including the accommodations that S.P. requires to catch up with her peer group and to participate in public or private school and S.P.'s need for and costs of healthcare services and private schooling. (Doc. 53 at 3, 16; Doc. 61 at 2, 4; Doc. 61-4 at 4). Dr. Conway wrote in his expert report (Doc. 61-4) that S.P. "needs high intensity, high frequency, evidence-based intervention for her

---

[2] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

[s]pecific [l]earning [d]isorders, AD/HD and her [d]evelopmental [c]oordination [d]isorder." (Doc. 61-4 at 3). Dr. Conway opines based on his experience "helping students with severe and many deficits," his review of S.P.'s medical and school records, his evaluation of S.P., and speaking to the Parneses and family members. (*Id.* at 4; Doc. 61 at 7–8; Doc. 61-3 ¶¶ 17, 23, 35, 36).

In fact, Dr. Conway evaluated S.P.'s records pertaining to her possible enrollment in the online program "Neuro-development of Words, LLC" (NOW!)—an EdTech company that Dr. Conway is affiliated with. (Doc. 61 at 7; Doc. 61-4 at 1–2, 4–5). Having done so, Dr. Conway opines that "only in-person treatment . . . will improve [S.P.'s] . . . developmental difficulties that are essential for paper and pencil, desktop and board to paper academic activities." (Doc. 61 at 7; Doc. 61-4 at 1–2, 4–5). And he opines that S.P. will need "6 hours per day, five days per week of one-to-one . . . treatment . . . to fully develop her academic skills to her oral language skills and abilities." (61-4 at 4; Doc. 61 at 7–8; Doc. 61-3 ¶¶ 17, 23, 35, 36). Those one-to-one services would "likely" have a duration of "6 months, with a re-evaluation . . . and then perhaps another 4-6 months of . . . interventions, with post treatment testing at the end to facilitate transition to a proper school environment." (Doc. 61-4 at 4–5). He states that if at the end of "the 12 month intensive, transdisciplinary team intervention [S.P.] is still in need of ongoing supports . . . then she will likely need placement in a small-class, private school environment." (*Id.*).

And Dr. Conway recommends that S.P. "receive ongoing [occupational therapy] and speech-language therapy on a daily basis for a minimum of 20-30 minutes." (*Id.*) He estimates that one year of services would cost about $168,000, plus an additional $5,000 for pre-treatment testing and $3,500 for mid-point testing. (*Id.*). Other costs that he estimates include $20,000 a year in private school tuition and $10,000 a year for weekly occupational therapy and speech-language therapy services until S.P. graduates from high school. (*Id.* at 5–6).

### A. Dr. Conway is Qualified to Provide Opinion Testimony

As an initial matter, contrary to the Board's argument, Dr. Conway's experience, training, and education qualify him to testify to the accommodations that S.P. requires to catch up with her peer group and to participate in public or private school. (Doc. 53 at 3 (citing Fed. R. Civ. P. 37, Fed. R. Evid. 702, *Daubert*, 509 U.S. at 597)). "Experts may be qualified in various ways," including by "knowledge, skill, experience, training, or education." *Frazier*, 387 F.3d at 1260 (emphasis omitted) (quoting Fed. R. Evid. 702).

From 1989 until 2008, Dr. Conway "completed supervised pre-doctoral and post-doctoral training in the diagnosis and treatment of [n]eurodevelopmental [d]isorders in children and adults at The Morris Center [(TMC)]." (Doc. 61-4 at 1, 2). Dr. Conway received his bachelor's degree in psychology, and he holds a Ph.D. in clinical psychology with a concentration in

neuropsychology. (Doc. 61-2 at 1). After completing his Ph.D., he completed a post-doctoral fellowship at the VAMC[3]-Brain Rehabilitation Research Center of Excellence. (*Id.*).

Since 2008, Dr. Conway has owned or managed TMC clinics in Ocala, Florida; Ponte Vedra Beach, Florida; Birmingham, Alabama; Port of Spain, Trinidad and Tobago, West Indies; and NOW!, an EdTech company. (Doc. 61-4 at 1–2). Also, since 2008, he has been training and directing teams of healthcare professionals (occupational therapy, speech-language therapy, clinical psychology/neuropsychology) and educators in the transdisciplinary assessment and treatment of neurodevelopmental disorders. (Doc. 61-2 at 1). And he has co-authored numerous publications, (*see id.* at 7–10; Doc. 61-4 at 1–2), and provided training courses and workshops to professionals, (*see* Doc. 61-2 at 11–12). Dr. Conway is "professionally trained and published in lifespan neuropsychology, neurorehabilitation, neuroimaging ([single-photon emission computed tomography], [functional magnetic resonance imaging], and [diffusion tensor imaging]) and neurodevelopmental transdisciplinary team assessment and team treatment of [n]eurodevelopmental [d]isorders for children, teenagers and adults." (Doc. 61-3 ¶ 1; *see also* Doc. 61-4 at 1–2).

Nonetheless, the Board claims that because Dr. Conway is not licensed in

---

[3] Veterans Affairs Medical Center.

Florida or another state, he is unqualified to serve as an expert in psychology, school psychology, occupational therapy, speech-language pathology, or K–12 educational needs. (Doc. 53 at 8–9). Here, the Board points to the lack of information in Dr. Conway's expert report or curriculum vitae that he is a licensed psychologist, school psychologist, licensed occupational therapist, or licensed speech-language pathologist in Florida (or any other state). (*Id.* at 9–12 (citing §§ 490.003(7), 490.003(8), 490.005, 490.006, 490.013, Fla. Stat.)). Also, the Board asserts that he is unqualified because he has never taught in a K–12 classroom in Florida and he is not a licensed educator in Florida. (*Id.* at 12).

To the extent that the Board argues that Dr. Conway is unqualified because he is unlicensed in Florida, it has not stated how "this renders [Dr. Conway] unqualified in this case." *State Farm Mut. Auto. Ins. v. Complete Care Ctrs., LLC*, No. 6:20-CV-1240-WWB-EJK, 2022 WL 16844858, at *3 (M.D. Fla. Sept. 21, 2022) (citing *Balthazar Mgmt., LLC v. Beale St. Blues Co.*, No. 17-cv-81214, 2018 WL 6928698, at *4 (S.D. Fla. Oct. 30, 2018)). Moreover, the Board fails to explain its arguments that he is not licensed as a speech-language pathologist in any jurisdiction or as an educator in Florida. *See State Farm Mut. Auto. Ins.*, 2022 WL 16844858, at *3. This argument goes to the weight that a trier of fact might give the testimony, but it does not preclude admissibility. *Id.* (citing *McDowell v. Brown*, 392 F.3d 1283, 1297 (11th Cir. 2004), and *Ledbetter*

*v. Blair Corp.*, No. 3:09-CV-843, 2012 WL 2464000, at *9 (M.D. Ala. June 27, 2012)).

Finally, the Board argues that Dr. Conway is unqualified because he "never personally treated, evaluated, or assessed S.P. in a clinical or school setting." (Doc. 53 at 12). The Board fails to provide any basis for this assertion, which Dr. Conway expressly rebuts in his declaration. (Doc. 61-3 at 6–7). The Parneses submit that Dr. Conway has evaluated S.P., reviewed her medical and school records (including those that the Board produced), and has spoken with S.P. and her parents on "numerous occasions regarding [her] education." (*Id.* ¶¶ 14, 17, 23, 35, 36; Doc. 61 at 7–8 & n.2). Indeed, his expert report (Doc. 61-4) "was based on evaluation, information, and the status of [S.P.] at that time." (Doc. 61-3 ¶¶ 35, 36).[4] His "conclusions and recommendations for her treatment plan will likely be modified if she is to enroll in [his] program." (*Id.* ¶ 36). Thus, he took "the appropriate steps to evaluate" S.P. (*Id.* ¶ 35). Accordingly, Dr. Conway is sufficiently qualified to opine as an expert in this case. (Doc. 61 at 4).

### B. Dr. Conway is Not Offering a Causation Opinion

Next, the Board argues that Dr. Conway's report is limited to S.P.'s

[4] The Parneses state that it was unnecessary for Dr. Conway to perform another assessment or evaluation of S.P. because the Board does not dispute that she suffers from disabilities. (Doc. 61 at 8). Thus, Dr. Conway's attention was focused on the remediation of S.P.'s education, brain development, and learning. (*Id.*).

**present** treatment, education, and schooling needs, and thus the Court should exclude his "causation" opinions. (Doc. 53 at 3, 7; Doc. 61 at 2). The Board submits that the "causation" opinions that Dr. Conway will offer are: (1) the alleged acts or omissions on the part of the Board, (2) the adequacy and appropriateness of any services and supports the Board provided S.P., and (3) whether the Board damaged or harmed S.P. (Doc. 53 at 3, 7; Doc. 61 at 2). The Parneses explain that Dr. Conway's report does not opine as to "causation" because he is not going to offer a "causation" opinion. (Doc. 61 at 2–3). Thus, Dr. Conway will not be permitted to provide a "causation" opinion.

### C. Reliability of Dr. Conway's Methodology

Next, the Board argues that Dr. Conway's proposed opinions are not based on a reliable methodology and are simply *ipse dixit* that will not assist the jury. (Doc. 53 at 3). The Board says the Parneses failed to demonstrate that his proposed testimony is scientifically valid because his expert report does not address the four factors identified in Federal Rule of Evidence 702. (*Id.* at 13). The Court is not persuaded.

First, Dr. Conway's opinions will help the jury to understand the parties' positions and the remedies that the parties believe are appropriate or inappropriate. (Doc. 61 at 12). Unlike the Board's citation to *Clarke,* Dr. Conway's opinion will assist the jury. (*Id.* at 18–19 (citing *Clarke v. Schofield*, 632 F. Supp. 2d 1350, 1368–70 (M.D. Ga. 2009))). In *Clarke*, the court precluded

a doctor from opining as an expert on a decedent's cause of death. 632 F. Supp. 2d at 1368–70. The court found that the doctor, an emergency room physician, would clearly qualify "as an expert in a medical malpractice case against a physician practicing family medicine or emergency medicine, but [the] case [did] not involve standard of care questions or questions about the diagnosis or treatment of (DVT) [deep venous thrombosis] or (PE) [pulmonary emboli]." *Id.* at 1357. Thus, the doctor was not allowed to opine as an expert because he would be "testifying . . . about questions that go beyond the scope of his regular medical practice." *Id.* While the doctor may have permissibly opined "*in general* about diagnosing and treating DVT and PE," he could not opine as an expert "in determining the location of a DVT or the cause or etiology of a DVT in a specific case." *Id.* The doctor did "not treat dead patients" and he could not "perform the standard clinical examination that he uses for live patients to form opinions about a corpse." *Id.* at 1358.

Here, unlike in *Clarke,* Dr. Conway's opinions are not so speculative (or outside the bounds of what he does) that his opinions will fail to assist the jury. And while the Board argues that Dr. Conway's lack of licensure means he will not assist the jury, as previously discussed "lack of board-certification [or a license] goes to weight, not admissibility." *State Farm Mut. Auto. Ins.*, 2022 WL 16844858, at *3 (citing *McDowell,* 392 F.3d at 1297 and *Ledbetter,* 2012 WL 2464000, at *9). Thus, Dr. Conway's opinions will assist the jury.

Second, Dr. Conway's opinions are based on sufficient facts and data. The records that Dr. Conway reviewed were produced to the Board and consisted of S.P.'s school records, medical records, and evaluations. (Doc. 61 at 8 & n.2; Doc. 61-3 ¶ 17). Moreover, Dr. Conway interviewed S.P., her parents, and family members. (Doc. 53 at 15; Doc. 61 at 8). Unlike in *Trasylol*, which the Board cites in support of its argument that "good grounds" do not support Dr. Conway's opinion, Dr. Conway submits that he has reviewed S.P.'s medical records. (Doc. 53 at 15 (citing *In re Trasylol Prod. Liab. Litig.*, No. 08-MD-01928, 2013 WL 1080552, at *2, *8 (S.D. Fla. Mar. 14, 2013) (finding physician's opinion that decedent died from exposure to pharmaceutical during a surgery was not based on a reliable methodology where physician did not review records predating hospitalization for surgery and did not review complete records of hospitalization))). Dr. Conway "review[ed] all of [S.P.]'s school records covering the past six to seven years, . . . reviewed all evaluations of disabilities[,] . . . [and] reviewed [S.P.'s] IEP plans, notes and records from her schooling in the Orange County School System and subsequent institutions where her[] parent[s] sought to obtain remediation services." (Doc. 61-3 ¶ 17).

Third and fourth, Dr. Conway's proposed opinions as to the accommodations that S.P. requires to catch up with her peer group and to participate in public or private school are reliable. The Parneses state that Dr. Conway used peer reviewed and accepted principles to evaluate S.P.'s school

records and medical records. (Doc. 61 at 10 (citing Doc. 61-4 at 1–4 and Doc. 61-3 at 5–10)). His opinion connects his experience and secondary sources to S.P.'s school and medical records such that it is the product of reliable principles and is based on reliable methodology. (*See, e.g.*, Doc. 61-4 at 2–3). Therefore, Dr. Conway's proposed opinion as to the accommodations that S.P. requires to catch up with her peer group and to participate in public or private school are reliable.

However, Dr. Conway's opinions about the costs of private schooling and healthcare are unreliable. (Doc. 53 at 16). As the Board notes, his company may charge certain rates, but there is insufficient information in his expert report to support his testimony as an expert regarding the costs of healthcare, educational services, or private school tuition in the community at large. (*Id.*).[5] Like in *Tundidor*, Dr. Conway does not provide support for his calculation of the costs of S.P.'s **potential** treatment. (*Id.* (citing *Tundidor v. Carnival Corp.*, 19-CV-25137, 2023 WL 2388499, at *4 (S.D. Fla. Jan. 10, 2023))). He provides the following estimates for healthcare costs: an initial $5,000 flat fee for a transdisciplinary team assessment that is done pre-treatment to guide or develop the treatment plan;[6] $14,000 per month for "essential treatment

---

[5] Here, the Board lumps in Dr. Conway's opinion about S.P.'s educational needs "until she graduates from high school" in its discussion of the reliability of his cost opinion. However, that opinion is more appropriately grouped with the prior discussion about his opinion on the accommodations that S.P. needs.

[6] Transdisciplinary team assessments comprise "comprehensive [occupational therapy], [speech-language therapy] and [p]sychoeducational testing." (Doc. 61-4 at 4).

services at [TMC]" that will "likely . . . span up to one year of services (~ $ 168,000.00);[7] and $3,500 for mid-point testing at six months." (Doc. 61-4 at 4).[8] While these costs may be what TMC charges for healthcare services, no basis for them has been provided. (*See* Doc. 61-4 at 4). Dr. Conway's report does not set forth the cost of individual services or what is included in, for example, the $14,000-a-month figure. Likewise, there is no cost estimate for the online program (NOW!) that S.P. is enrolled in; it is not clear whether that program is included in the $14,000 monthly figure or if it is a separate cost.

Moreover, Dr. Conway does not submit that he has testified as an expert witness regarding medical coding or the reasonableness of medical billing. *Compare* (Doc. 61-4 at 6), *with Serrano v. Fam. Dollar Stores of Fla., LLC*, No. 19-81257-CIV, 2021 WL 3036673 (S.D. Fla. June 9, 2021) (denying motion to exclude physician's expert opinion because, *inter alia*, he was a certified medical coding expert, he testified as an expert in several cases about medical coding and reasonableness of medical billing, and he compared plaintiff's medical billing to Medicare rates and to "several authoritative sources"). And he does not submit that his opinion on S.P.'s medical billing was the result of considering

---

[7] $168,000 = 14,000 x 12

[8] Dr. Conway attests that while the costs may seem high, "the standard rate for [speech-language therapy] and [occupational therapy] services [is] typically $150/hour and thus a true 'Cadillac' level of services . . . would cost $234,000 per year." (Doc. 61-4 at 4). Dr. Conway's report indicates that end-of-treatment testing may be a separate cost, but he does not provide any cost attributable to that testing. (*Id.*).

authoritative sources on the subject. *See id.* Nor does he explain how he determined "typical" rates in the area, and there is no support for this determination other than Dr. Conway's own report.

Likewise, Dr. Conway's opinion on the cost of private schooling is unreliable. He states that "[t]he cost[s] for such private school services are likely . . . $20,000 per year in school tuition and $10,000 per school year for [occupational therapy] and [speech-language therapy] services weekly until [S.P.] graduates from high school." (*Id.* at 4–5). As with Dr. Conway's opinion on healthcare costs, he fails to provide "any explanation of the basis, facts, or data considered in reaching" his opinion as to S.P.'s continuing treatment and educational costs. And he does not cite to any other resource to support his opinions. As a result, his methodology is insufficiently reliable for him to offer an opinion on the continuing treatment and educational costs in this case. Thus, Dr. Conway's cost opinions must be excluded.

## IV. CONCLUSION

For the reasons explained above, it is **ORDERED** that the Board's *Daubert* motion (Doc. 53) is **GRANTED** in part and **DENIED** in part. The Court excludes Dr. Conway's opinions as to causation, healthcare costs, and schooling costs. The motion to exclude is otherwise **denied**.

**DONE** and **ORDERED** in Orlando, Florida, on September 24, 2024.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record